IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THE LIONS CLUB OF ALBANY,
CALIFORNIA, a non-profit corporation,

    Plaintiff,

v.

THE CITY OF ALBANY, a charter city, *et al*.,

    Defendants and Counter-Claimants,

v.

THE LIONS CLUB OF ALBANY,
CALIFORNIA, a non-profit corporation, and
THE ALBANY LIONS CLUB FOUNDATION,

    Counter-Defendants.

No. C 17-05236 WHA

**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

A cross on a hill stands at the center of this case. The town wants it down. The sponsor wants it up. Both sides invoke the First Amendment and both have moved for summary judgment.

## STATEMENT

Since 1971, a twenty-foot electrically-illuminated steel and plexiglass Latin cross has stood atop Albany Hill, the prominent knoll near the intersection of Interstates 80 and 580. At the time of its erection, the 1.1 acres hosting the cross belonged to Hubert and Ruth Call

(who lived in Albany but not on the 1.1 acres). They allowed The Lions Club of Albany, California, a non-profit corporation, to erect the cross and to illuminate it (and the Lions Club proceeded to illuminate it every Christmas and Easter season up to the present) (Dkt. Nos. 43 at 10, 44, Exh. TTT). Hubert Call was then a member of both the Lions Club and Albany City Council.

All would have remained well for the cross but for a multi-party real estate deal by which defendant The City of Albany acquired title to the 1.1 acres along with adjacent parcels in exchange for approving a high-rise project nearby. The details remain important, so this order will lay them out.

Developer Interstate General Corporation (IGC) sought to develop high-rise condominiums on its real property located along the western slope and base of Albany Hill. In April 1972, IGC asked the City for permission for the development. The City saw opportunity and replied that it wanted an "overlook" park on Albany Hill. In May 1972, the Albany City Council passed an ordinance requiring a Council-issued use permit before any building or structure could proceed on Albany Hill. IGC's land and the Call's land (including the cross) fell within this restriction.

In July 1972, IGC applied to the Council for a use permit. In October 1972, the City proposed conditions for issuing the requested use permit, including requiring IGC to deed the City two hilltop acres for parkland use. After a series of negotiations, IGC eventually proposed a so-called "$600,000 plan" — a complex multi-party agreement involving, among others, IGC (and its affiliates), the City, and the Calls. Under this plan, IGC offered to allocate $600,000 of its own money to purchase additional private property for the City's desired Overlook Park (now Albany Hill Park) — including the Calls' 1.1 acres at the summit of Albany Hill — and to convey it to the City. In November 1972, the Council issued IGC's use permit and accepted IGC's proposed $600,000 plan (Dkt. No. 44, Exh. TTT).

Pursuant thereto, IGC offered to pay the Calls $258,000 for title to their 1.1-acre parcel "free of liens, encumbrances, easements . . . and conditions of record . . . other than exceptions

2

of record." 38 Cal. 3d at 641.[1] IGC and the Calls eventually reached an agreement whereby the Calls deposited two grant deeds into escrow — a grant deed conveying the Call parcel to an IGC affiliate and another grant deed conveying to the Lions Club an "easement for ingress and egress to maintain the existing cross standing" on the Call parcel. Before closing escrow, Call insisted upon burdening the parcel with the easement and would sell only on the condition that the cross would remain with an easement for access. The developer went along and deposited in escrow a grant deed conveying the Call parcel to the City. That deed did not indicate that title to the Call parcel was subject to the easement (but it did not have to for the easement to be effective). *See* 38 Cal. 3d at 642 n.10. The City followed by depositing the building permit in escrow.

In the instant case, the City suggests that it was not actually aware of the easement but concedes that it was on at least constructive notice (*see* Dkt. No. 72). When escrow closed, the easement deed to the Lions Club was recorded before the grant deed to the City. 198 Cal. Rptr. at 330. The City thus acquired the Call parcel subject to the Lions Club's easement.

Taxpayers subsequently filed a suit challenging the City's land acquisition, alleging that Hubert Call's role as city council member at the time of the transaction created a conflict of interest. The taxpayer suit itself raised no easement or Establishment Clause problem. The City, the Calls, various council members, and IGC (and its affiliates) became named defendants. The suit became known as the *Thomson* litigation.

In 1978, the Alameda County Superior Court found that although the transaction was non-fraudulent and although Call had abstained in the approval process, Call nevertheless had a proscribed financial interest under California's Government Code Section 1090 in the agreement between IGC and the City. The Superior Court ordered the Calls to pay the City the

---

[1] Citation to "38 Cal. 3d" refers to the California Supreme Court decision, which can be more fully found at *Thomson v. Call*, 38 Cal. 3d 633 (1985). Citation to "198 Cal. Rptr." refers to the California Court of Appeal decision in related litigation, which can be more fully found at *Thomson v. Call*, 198 Cal. Rptr. 320 (Ct. App. 1983). The Lions Club requests judicial notice of Exhibit TTT (Dkt. No. 44), and the City has not opposed. This exhibit is the judgment rendered in *Thomson v. The City of Albany*, Case No. 448248-8 (Alameda Cty. Super. Ct. May 2, 1978). A court may judicially notice a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b). Accordingly, the Lions Club's request for judicial notice is **GRANTED**.

1   full $258,000 amount (plus interest) received by the Calls for the parcel and denied relief as to
2   the other defendants (Dkt. No. 44, Exh. TTT).

3   The Establishment Clause became part of that litigation, ironically, at the behest of the
4   Calls. *See* 198 Cal. Rptr. at 336. They argued that the City's acceptance of the deed to the land
5   burdened by the easement protecting the cross violated the Establishment Clause. The trial
6   court, however, held that the City's acceptance of the Call parcel was consistent with the
7   Establishment Clause because of the acquisition's secular purpose (namely, "to provide
8   additional park land to the City"), it neither advanced nor inhibited religion, and it did not
9   constitute excessive governmental entanglement with religion (Dkt. No. 44, Exh. TTT).

10  On appeal, the Calls challenged their liability and the taxpayers appealed the denied
11  relief as to the corporate defendants. The California Court of Appeal affirmed the lower court's
12  holding that the agreement between IGC and the City was void due to Call's proscribed
13  financial interest in the contract under Section 1090. (This had nothing to do with the
14  easement.) *Thomson v. Call*, 198 Cal. Rptr. 320, 342 (Ct. App. 1983).

15  In challenging their liability, the Calls again argued that the City's acquisition of the
16  land burdened with an easement protecting the "Christian type cross" was constitutionally
17  invalid. *Id*. at 336. The California Court of Appeal noted the potential constitutional infirmities
18  presented by the cross, stating that "the cross and the easement present problems requiring
19  consideration," including "some of the constitutional proscriptions cited by the Calls." *Ibid*.
20  It, however, refused to let the Calls escape the consequences of Section 1090 "by reason of
21  problems of their own making." *Ibid*. The cross and easement did not affect the invalidation
22  of the contract between IGC and the City. That invalidity was due to Call's conflict of interest.
23  *Id*. at 337. Moreover, the California Court of Appeal held that IGC breached its contract with
24  the City by allowing the land to be burdened with the easement and reversed, *sua sponte*, the
25  trial court's "narrow view" of the pleadings, which it believed led the trial court to let IGC
26  "escape liability to the City." *Id*. at 340.

27  The California Court of Appeal left undisturbed the trial court's finding that the City's
28  acquisition of the Call parcel was valid because it had the secular purpose of public park use.

4

*Id*. at 336. It, however, distinguished this finding from the constitutional problems related to the land's value and "its use as a public park in the future." *Id*. at 337. Indeed, the California Court of Appeal found that because the easement protected the cross's location and existence, "the land is consequently unsuitable for use as a municipal park because of the constitutional proscriptions which preclude the display of a religious symbol on public property." *Id*. at 339.

The California Supreme Court vacated the Court of Appeal's decision in answering the specific question of what remedies were available once a Section 1090 violation was found and the fully performed underlying contract was adjudged void. *Thomson*, 38 Cal. 3d at 638. The California Supreme Court upheld — without reaching the constitutional analysis — the trial court's remedy of allowing the City to both keep the Call parcel and recover $258,000 plus interest from the Calls. *Id*. at 651–52. The California Supreme Court affirmed that the IGC-City contract was void due to Call's Section 1090 violation (the conflict of interest problem). *Id*. at 646. It, however, reversed the California Court of Appeal's finding that IGC was liable to the City, noting that the $600,000 plan "did not vest in the city any right or power to control the real property acquisitions of IGC in its performance of the plan." *Id*. at 653.

The California Supreme Court addressed the easement only in the Section 1090 context. After acknowledging without commenting on the trial court's constitutional findings, it then evaluated potential remedies for Call's Section 1090 violation. In evaluating the potential remedies, it recognized that the Call parcel's fair market value was "obviously" diminished by the easement and cross, which affected development prospects on the parcel. *Id*. at 651.

Justice Stanley Mosk concurred in the judgment against the Calls and dissented in the absolution of the corporate defendant's liability. *Id*. at 653. Justice Mosk noted that although IGC "was motivated solely by a desire to obtain a building permit and to protect its development," it knew the City wanted to make a public park at Albany Hill's summit and thus promised the City "a unique, superb and useful view park for the public enjoyment." *Ibid*. Thus, IGC's contract "obligated [IGC] to convey fair value to the city in the form of *land suitable for use as a public park*." *Id*. at 654 (emphasis added). Justice Mosk further noted that due to the easement's protection of the location and existence of the cross, the land was

5

rendered "unsuitable for use as a park because of the constitutional proscriptions precluding the display of a religious symbol on public property." *Ibid*. By allowing the Call parcel to be burdened by the easement, Justice Mosk believed that IGC thus negated the City's very purpose in acquiring the land, as "of course, *the perpetual religious symbol rendered the property legally unsuitable for park* or other public purposes." *Ibid*. (emphasis added). These separate comments took for granted the validity of the easement.

So, the litigation ended, and Albany Hill Park took shape as municipal undeveloped space with tall eucalyptus trees bisected by a walking trail with a large cross near the summit.

Decades passed.

Every Christmas and Easter season, the Lions Club turned on the switch to illuminate the cross, visible all the way to the East Bay Hills. Those enjoying the park could hardly miss the cross, it being next to the trail and being the park's largest structure (actually the *only* structure other than gates, benches, signs, and a rope swing).

In 2015, East Bay Atheists began criticizing the cross. In 2016, municipal officials had PG&E shut down power to the cross for 106 days. The City claims the shutdown came as a result of legitimate safety issues and fire hazards. The Lions Club claims it came as part of a harassment campaign to force the cross off the hill (Dkt. Nos. 44 at 11–14, 46 at 9–11).

In September 2017, the Lions Club commenced this civil action against the City and five city officials in their individual and official capacities, alleging a conspiracy between defendants and the East Bay Atheists. The Lions Club alleges the conspiracy began in November 2015 when the City began raising allegedly bogus safety concerns about the electrical wire connected to the disputed cross (Dkt. Nos. 1, 43 at 11, 47 at 2).

In November 2017, the City and five city officials counterclaimed against The Lions Club of Albany (and its affiliates).[2] The gravamen of the City's claims focuses on the invalidity and unenforceability of the Lions Club's easement under the United States and California Constitutions.

---

[2] The Lions Club International and the individual defendants in their individual capacities have since been voluntarily dismissed (Dkt. Nos. 41, 68).

6

The Lions Club now moves for summary judgment both on their claims and against the counterclaims. The Lions Club's claims include (1) taking of property without compensation; (2) interference with easement; (3) due process violations under the United States and California Constitutions; (4) equal protection violations under the United States and California Constitutions; (5) free speech violations under the United States and California Constitutions; (6) free exercise violations under the United States and California Constitutions; and (7) costs, expenses, and reasonable attorney's fees (Dkt. No. 43 at 3–4).

The City cross-moves for summary judgment on its counterclaims. The counterclaims include (1) quiet title; (2) trespass; (3) nuisance; (4) an injunction to remove the cross; and (5) partial summary judgment against punitive damages (Dkt. No. 47 at 1–2).[3]

With counsel for all parties, the undersigned judge conducted a view of Albany Hill Park and the cross on June 5, 2018 (Dkt. No. 82). The following photographs were taken by his law clerk:




Front View From Off-Trail     Side View From Trail (Near Summit)

---

[3] The City objects to the Lions Club's second motion for summary judgment against the City's counterclaims. The City argues that the Lions Club's second motion violates the page limit under Civil Local Rule 7-2(b), which limits motions to 25 pages in length. The Lions Club's two motions are sufficiently different in substance. Thus the City's objection is **OVERRULED**.

7

**ANALYSIS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact. FRCP 56(a). A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

**1.   THE LIONS CLUB'S EASEMENT WAS VALID AB INITIO.**

A private land owner is perfectly free to erect a cross on his or her land (subject, of course, to zoning ordinances). Likewise, a private land owner is perfectly free to allow someone else to erect a cross on the owner's land and to grant an easement to maintain it. If the owner sells the land, the buyer must take the land subject to the easement. So, when the Calls allowed the Lions Club to erect the cross and granted it an easement for maintenance, all was well.

The City nevertheless argues that the easement in question was created for the unconstitutional purpose of protecting a cross's presence on what was destined to become public land. True, an easement may not authorize activity prohibited by a zoning ordinance or other pertinent laws. *See Baccouche v. Blankenship*, 154 Cal. App. 4th 1551 (2007); *Teachers Ins. & Annuity Ass'n. v. Furlotti*, 70 Cal. App. 4th 1487 (1991). Here, no zoning ordinance prohibited the cross. Nor did the cross's presence on the Calls' land raise any constitutional issues. The Calls remained free to sponsor the cross and to grant an easement.

The City cites *First Unitarian Church of Salt Lake City v. Salt Lake City Corporation*, 308 F.3d 1114 (10th Cir. 2002), to argue that an easement is invalid if it violates the First Amendment. In *First Unitarian*, a city retained a public pedestrian easement after selling a portion of a public street to a religious entity. *Id*. at 1117. The easement, however, restricted expressive activities. *Id*. at 1118. The United States Court of Appeals for the Tenth Circuit held that because the public easement constituted a traditional public forum, the restriction violated the Free Speech Clause. *Id*. at 1123, 1133.

*First Unitarian* is distinguishable. *First*, that court held that the easement's *restrictions* on speech activities were invalid. The court did not render the easement itself invalid or

1  unenforceable.  *Second*, the issue in *First Unitarian* focused on the *city's* actions with respect to
2  the easement's terms.  *Id*. at 1122.  Here, the easement's terms were solely between the Calls
3  and the Lions Club.

4        This order assumes for the sake of argument that the purpose of the easement was to
5  require subsequent owners to honor the cross, including public owners.  Nevertheless, the City,
6  which was on at least constructive notice of the easement, could have simply refused to close
7  the deal.  As was observed in the *Thomson* litigation, "[h]ad the City refused to accept the Call
8  Parcel in performance of the $600,000 Plan, IGC would have retained said real property under
9  its ownership" (Dkt. No. 44, Exh. TTT).

10        While the City portrays itself as a victim of the easement, the fact is that the City must
11  bear responsibility.  To repeat, the City could have rejected the deal, burdened as it was by the
12  easement.  The First Amendment ran against the City, not the private parties.  Once the City
13  accepted title and began converting the land into a public park, it then could have solved its
14  Establishment Clause problem by condemning the easement (and paying its value) under its
15  power of eminent domain, selling off, if feasible, a subdivided parcel containing the cross to a
16  private party (and keeping the rest for a park), or by possibly imposing zoning restrictions
17  against all religious displays on public land.

18        Ultimately, the City cites no First Amendment authority for the idea that an otherwise
19  *valid* easement simply goes limp the moment the land goes into the City's ownership.  That
20  theory would turn the *Thomson* litigation on its head — the easement issues addressed by the
21  trial court all the way to the California Supreme Court could have been easily waved away had
22  the easement problem been as simply avoided as by a theory of unenforceability upon public
23  ownership.

24        **2.**     **THE PUBLIC PARK WITH THE CROSS VIOLATES THE ESTABLISHMENT CLAUSE.**

25        To repeat, the Establishment Clause runs against public entities, not private parties.
26  After the City acquired the land burdened with the cross and turned it into a public park, the
27  City also acquired an Establishment Clause problem and should have solved it by condemning
28

9

the easement via its power of eminent domain, selling off a parcel with the cross to a private party, or enacting a valid zoning ordinance. Now follow the details.[4]

### A. Federal Establishment Clause.

The Establishment Clause of the First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion . . . ." The Establishment Clause has come "to mean that government may not promote or affiliate itself with any religious doctrine or organization . . . ." *Cty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014). It runs against all governments — state, local, and federal. *See Everson v. Bd. of Ed. of Ewing Tp.*, 330 U.S. 1, 15 (1947).

The *Lemon* test still generally governs in evaluating an alleged Establishment Clause violation. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971); *Trunk v. City of San Diego*, 629 F.3d 1099, 1106 (9th Cir. 2011). The *Lemon* inquiry asks whether the religious practice or symbol at issue (1) has a secular purpose; (2) has a primary effect that neither advances nor inhibits religion; and (3) does not foster excessive state entanglement with religion. *Lemon*, 403 U.S. at 612–13. "[T]he challenged [government] practice must survive all three prongs of the *Lemon* analysis in order to be held constitutional." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1396–97 (9th Cir. 1994).

This order holds, based on our own court of appeals' holdings in cross cases, that the primary effect of the continued presence of the Albany Hill cross advances religion. Thus, under the second prong, municipal ownership and park use of land burdened with the cross violates the Establishment Clause.

The second prong "asks whether, irrespective of government's actual purpose, the practice . . . in fact conveys a message of endorsement or disapproval [of religion]." *Lynch v. Donnelly,* 465 U.S. 668, 690 (O'Connor, J., concurring). *Buono v. Norton*, 371 F.3d 543

---

[4] The City also argues the cross is unconstitutional under the California Constitution's No Preference and No Aid Clauses. Our court of appeals instructs that "courts should avoid adjudication of federal constitutional claims when alternative state grounds are available." *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991). Here, while the No Preference Clause is applicable, federal constitutional analysis is appropriate in light of apparent tension in the California Constitution's No Preference Clause jurisprudence. *See East Bay Asian Local Dev. Corp. v. State of California*, 24 Cal. 4th 693, 719 (2000).

1  (9th Cir. 2004), directs this analysis.  Our court of appeals held in *Buono* that the display of a
2  Latin cross on public land impermissibly conveyed endorsement of a particular religion in
3  violation of the Establishment Clause.  It found such a primary effect even though the cross was
4  originally erected and maintained by private individuals and meant to serve as a war memorial.
5  *Id*. at 548–50.

6      *Buono* relied on *Separation of Church & State Committee v. City of Eugene of Lane
7  County, State of Oregon*, 93 F.3d 617, 620 (9th Cir. 1996), which held that "[t]here is no
8  question that the Latin cross is a symbol of Christianity, and that its placement on public land
9  by the City of Eugene violates the Establishment Clause[, b]ecause the cross may reasonably be
10 perceived as governmental endorsement of Christianity."  And, in a similar case, the United
11 States Court of Appeals for the Tenth Circuit also so held in *American Atheists, Inc. v.
12 Davenport*, 637 F.3d 1095 (10th Cir. 2010), holding that privately-owned and maintained
13 memorial crosses bearing official insignia on public land had the primary effect of
14 governmental endorsement of Christianity.

15     Similar to *Buono*, the cross at issue here is a large, twenty-foot Christian cross bolted
16 permanently into a concrete base and prominently displayed at the summit of a public park.
17 This overtly religious symbol, which stands alone, is prominent in the park itself and remains
18 visible, through clearings in the trees, far beyond the parkland's immediate vicinity (*see* Dkt.
19 No. 43, Exh. A).  The cross stands close by the only public trail through the park and close by
20 park benches, all of which remains reachable on foot within a couple of minutes from the
21 parking lot.  The cross is illuminated during Easter and Christmas seasons.  And, unlike in
22 *Buono*, the cross has never been a war memorial.  It is solely a religious symbol (*see* Dkt. Nos.
23 43 at 11, 60, Exh. Z).

24     The Lions Club argues decisions such as *Buono* do not govern because they do not apply
25 to private actors.  The Lions Club, not the City, built and maintains the cross, it says.  And, the
26 easement, the Lions Club argues, is no weaker a property right than a fee simple — had the cross
27 been on a small parcel titled to the Lions Club, there would, it says, have been no constitutional
28 issue.

11

1    *First*, *Buono* acknowledged that the conduct there at issue originally derived from private
2    citizens. *Buono*, 371 F.3d at 548. The mere fact that private conduct is involved does not
3    preclude Establishment Clause concerns once the land arrives in public hands. And, to the
4    extent that the Establishment Clause and *Buono* (in which the cross was eventually deeded to the
5    City) require government action to apply, such government action is plainly present in the instant
6    case. Here, the City owns and uses as a public park land burdened by an easement perpetuating
7    the religious symbol.

8    The relevant inquiry for evaluating the primary effect of the City's parkland burdened
9    with the easement and the cross is whether a "reasonable observer" would *perceive*
10   governmental endorsement of religion.[5] *See id*. at 549–50. Here, a reasonable observer would
11   perceive — knowing "the history and context of the community and forum in which" the cross
12   appears — an impermissible endorsement. The reasonable observer would be aware that the
13   cross stands on city parkland, it celebrates Christian holy days, and the City has supported this
14   religious activity for decades (*see* Dkt. Nos. 44 at 28–29, 79 at 1).

15   *Second*, it is true that the Establishment Clause problem might go away if the cross stood
16   on a separate, coherent *private* parcel even though adjacent to the parkland. But it is not on a
17   separate parcel. The cross stands on public land. The easement is not a separate parcel, much
18   less a separate coherent parcel. Contrary to counsel, we cannot treat the easement as if it were a
19   condominium hovering over and separate from the land itself. Were that the case, then
20   municipalities could grant religious easements with abandon and avoid First Amendment
21   liability.

22   The Lions Club cites *Van Orden v. Perry*, 545 U.S. 677 (2005), the Ten Commandments
23   case. It, however, is distinguishable. The Supreme Court there permitted the Ten
24   Commandments display on state capitol grounds in part because of its *historic* significance.
25   Although the Ten Commandments monument had religious overtones, it also alluded to the
26   history of the United States government, as "[t]here is an unbroken history of official

---

[5] A reasonable observer would "be deemed aware of the history and context of the community and forum in which the religious display appears." *Buono*, 371 F.3d at 550 (citing *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780–81(1995)) (O'Connor, J., concurring)).

12

1 acknowledgment by all three branches of government of the role of religion in American life
2 from at least 1789." *Id*. at 686.  Here, the Lions Club cannot assert that the cross conveys
3 American history, has any other historical relevance, or serves some secular purpose.  Rather, the
4 Lions Club emphasizes the cross's plain religious significance (*see, e.g.*, Dkt. No. 60 at 7).

The Lions Club's reliance on *Salazar v. Buono*, 559 U.S. 700 (2010) — a related appeal following *Buono* — is also misplaced.  The sole question addressed by *Salazar* was whether a statute enabling a government transfer of land hosting a cross to a private party violated an injunction granted in *Buono* (the issue was remanded).  *Id*. at 706.  As such, our court of appeals' holding in *Buono* still controls under the facts of this case.  And, the dictum in *Salazar* seized upon by the Lions Club is distinguishable.  *Salazar* observed that "[t]he goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm" and that "[a] cross by the side of a public highway marking, for instance, the place where a state trooper perished need not be taken as" governmental endorsement.  *Id*. at 718–19.  Here, however, the cross at issue is not a memorial of any kind.  It is solely a religious symbol to celebrate holy days by casting its glow upon Christians and non-Christians alike.

"Whatever else the Establishment Clause may mean . . . it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)."  *Separation of Church & State Comm.*, 93 F.3d at 619 (citation omitted) (quoting *Cty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989)).  Here, the City's establishment of a public park featuring a large cross projects an appearance of governmental preference for the Christian religion.  Thus, the City's use of land bearing the cross fails to satisfy the primary effect prong and accordingly violates the Establishment Clause.

### B. This Conclusion is Consistent with *Thomson*.

The Lions Club submits that the *Thomson* litigation established, once and for all, that the easement was valid and that the cross constituted no Establishment Clause violation.  This, however, is an overstatement, both of *Thomson* and of the law of res judicata and collateral estoppel.

Res judicata, or claim preclusion, "prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002). Collateral estoppel, or issue preclusion, "precludes relitigation of issues argued and decided in prior proceedings." *Ibid*. State-court judgments are given "the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 688 (9th Cir. 2004) (citation omitted).

While there are aspects in the *Thomson* litigation that still inform the real estate and easement issues in our present controversy, and while the First Amendment issue played a role in *Thomson*, we now have a new controversy that was not previously litigated — namely, whether the continued presence of a cross in a public park violates the Establishment Clause.

The primary focus of *Thomson* was the validity of the multi-party agreement masterminded by IGC and the Section 1090 issue. As such, *Thomson* analyzed the cross and easement mainly in terms of how they affected land value and prejudiced the suitability of the land for use as a public park. The constitutional issue arose as a gimmick by the Calls to escape the consequences of the conflict of interest — a ploy the courts disfavored.

The California Supreme Court, moreover, did not review the trial court's constitutional findings in affirming the trial court decision. *See id*. at 644. For that matter, the trial court's constitutional findings merely blessed the City's "*accepting the deed* to the Call Parcel" (Dkt. No. 44, Exh. TTT) (emphasis added). Here, by contrast, the issue is, once the City accepted the land, and once the City turned it into a public park with the cross, did the City thereby violate the Establishment Clause?

The California Court of Appeal recognized this distinction, stating that "the constitutional problems presented by the cross and the easement pertain only to . . . its use as a public park in the future. They do not reach the trial court's determinations . . . which were to the effect that the *acquisition* of the land by the City was valid" and that "[t]he existence of the cross and the easement does not affect the determination that the contract between ICG and the City was void." *Thomson*, 198 Cal. Rptr. at 336. It went further, stating that "the easement

14

actually protects the location and existence of the cross, and that the land is consequently *unsuitable for use as a municipal park* because of the constitutional proscriptions which preclude the display of a religious symbol on public property." *Id*. at 339 (emphasis added). Justice Mosk in his separate opinion echoed this distinction, stating that the "perpetual religious symbol rendered the property legally *unsuitable for park* or other public purposes." *Thomson*, 38 Cal. 3d at 654 (1985) (emphasis added). In other words, it was common ground among all concerned in *Thomson* that the easement was alive and well and its main effect on the deal was to render the land unsuitable for use as a public park and/or to diminish the value of the land.

Nevertheless, in the face of these warnings, the City, having accepted the raw land, proceeded to do exactly what was said to be unsuitable — namely, converting the land for use as a public park.

In sum, while the *Thomson* litigation conflicts with the City's unenforceability theory and while the trial court found that the City could accept the deed without violating the Establishment Clause, that litigation also recognized that downstream ("in the future") the land would be "unsuitable" for use as a public park by reason of the cross. The instant order, with the benefit of the downstream record, agrees that the land cannot continue as a public park with the cross on it.

**3.  THE CITY MUST REMEDY ITS FIRST AMENDMENT VIOLATION.**

To remedy the Establishment Clause violation, the City has at least two options — either sell a parcel containing the cross to a private party or condemn the easement through its power of eminent domain. Possibly, a third option would be to adopt a zoning ordinance banning all religious symbols from its public places.

If the City chooses to sell to a private party, it must do so at fair market value and it must do so in a manner that avoids other forms of Establishment Clause violations. The subdivision must be a coherent, separate parcel in such a manner that the public may recognize that the cross no longer stands on public land. If the City condemns the easement, it would have to pay the Lions Club just compensation, as determined by fair market value by a jury.

15

In the procedural context of this case, however, there is actually no party adverse to the municipal defendant seeking to pursue any of these avenues against the City. This order has reached this juncture only to explain why the City is wrong in its argument that the easement somehow became lifeless upon title flowing into public hands. Before the Court would entertain any motion to compel the City to deal with its Establishment Clause problem, a plaintiff with standing would need to move to intervene (and would need to do so promptly). At that point, the specifics of any remedial plan could be vetted to avoid yet further constitutional problems.

### 4. QUESTIONS OF FACTS REMAIN REGARDING THE EXTENT, IF AT ALL, THE CITY VIOLATED THE LIONS CLUB'S RIGHTS.

Meanwhile, the fact is that the cross has stood on Albany Hill for almost half a century and, even though the City should not have built its park around it, the cross has been a fact of life. The City should not have interfered (if it did) with the Lions Club's easement and/or religious observances.

Whether or not the City violated the Lions Club's free speech, free exercise, equal protection, and/or due process rights and/or interfered with the Lions Club's easement implicate heavily disputed facts. The City argues that it cut off electric power to the cross because it presented a safety hazard. The Lions Club argues that the City's safety concerns reek of pretext and that the scheme received ratification by the City's policymakers.

Genuine disputes of material facts exist. The Lions Club's motion for summary judgment on its free speech, free exercise, equal protection, due process, and interference with easement claims are thus **DENIED**. A jury will have to decide.

### 5. MISCELLANEOUS CLAIMS.

#### A. California Takings Clause.

The Lions Club claims that the City violated the California Takings Clause by disconnecting the electricity to the cross. Article I, Section 19 of the California Constitution provides that "[p]rivate property may be taken or damaged for public use only when just compensation . . . has first been paid to . . . the owner." This provision "never was intended, and never has been interpreted, to impose a constitutional obligation upon the government to pay 'just compensation' whenever a governmental employee commits an act that causes loss of

16

1 private property." *Customer Co. v. City of Sacramento*, 10 Cal. 4th 368, 378 (1995).  Without
2 property taken or damaged for "public use," the Lions Club is not entitled to just compensation
3 under the California Constitution.  The Lions Club's motion for summary judgment on the
4 California Takings Clause claim is thus **DENIED**.

### B. Quiet Title.

The City seeks to quiet title on the ground that the Lions Club's easement was "granted for the improper, illegal and unconstitutional purpose of displaying a religious symbol on public property" and is thus invalid (Dkt. No. 46 at 15).  This order holds that the Lions Club's easement is valid (but that the City is obligated to condemn the easement or otherwise solve its Establishment Clause problem).  The Lions Club's motion for summary judgment in its favor on the quiet title claim is thus **GRANTED**.

### C. Trespass.

The City argues that the presence of the cross in its park constitutes trespass.  "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another. Such invasions are characterized as intentional torts, regardless of the actor's motivation." *Civic Western Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 16 (1977).  "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor . . . has placed on the land . . . with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated." *Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125, 1141–42 (1991).

Because the Lions Club's easement remains valid, its entry onto the City's land was authorized.  The Lions Club's motion for summary judgment in its favor on the trespass claim is thus **GRANTED**.

### D. Nuisance.

The City bases its private nuisance claim on "the unconstitutional condition perpetuated by" the cross's ongoing presence and the City's "seeming endorsement" of "Christianity above other religions and above no religion" (Dkt. No. 47 at 9–10).  It bases its public nuisance claim on the cross's unconstitutional condition, which is allegedly "offensive to many members of the

17

community," conveys the appearance of government religious preference, alienates certain community members, and "interferes with the use and enjoyment" of the park (Dkt. No. 46 at 17). The Lions Club counters that its cross is a "beloved symbol of Albany Hill" and causes no interference with the use and enjoyment of the public park (Dkt. No. 44 at 19).

We must remember that the Constitution runs against governmental entities, not private parties, and that the City, not the Lions Club, is the one who is violating the First Amendment.

The City cites decisions involving, for example, theaters and bookstores exhibiting obscene materials (*People ex rel. Busch v. Projection Room Theater*, 17 Cal. 3d 42 (1976)), construction of airport fuel tanks near an industrial park (*Koll-Irvine Center Prop. Owners Ass'n. v. County of Orange*, 24 Cal. App. 4th 1036 (1994)), and hazardous waste (*Mangini v. Aerojet-Gen. Corp.*, 230 Cal. App. 3d 1125 (1991)). The cross does not compare. The Lions Club's motion for summary judgment in its favor on the nuisance claim is thus **GRANTED**.

### E.   Request for Punitive Damages.

The Lions Club moves for punitive damages, arguing that the City's safety hazards concerns were a "contrived fraud" and that it was "relentlessly harassed" by the City (Dkt. No. 60 at 18–19). Punitive damages may be appropriate where a defendant "has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. A municipality, however, is immune from punitive damages under Section 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Moreover, regarding the Lions Club's interference with easement claim, whether the City's conduct amounts to fraud or oppression is disputed. The Lions Club's request for punitive damages is thus **DENIED**.

### CONCLUSION

Those of the Christian faith may dislike some conclusions in this order. If the tables were turned, however, and a Star of David or Star and Crescent instead blazed from the top of Albany Hill, how would they feel? The undersigned judge is confident that the fair-minded will see the problem. Please remember that religious faith is precious in our country, a most personal and individual choice. Our governments have no business sponsoring one or the other. That is the law under our First Amendment.

18

United States District Court
For the Northern District of California

1  For the reasons stated above, the Lions Club and the City's cross-motions for summary
2 judgment are **GRANTED IN PART AND DENIED IN PART**.  A further case management conference
3 will be held on **JULY 5 AT 11:00 A.M.**

**IT IS SO ORDERED.**

Dated:  June 15, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE